[Civ. No. 15158.   Second Dist., Div. Two.   Mar. 13, 1946.]

WILLIAM P. CANAVAN, Respondent, v. COLLEGE OF OSTEOPATHIC PHYSICIANS AND SURGEONS (a Corporation), Appellant.

512

Charles E. Hobart for Appellant.

Finlayson, Bennett & Morrow and John C. Morrow for Respondent.

MOORE, P. J.—Respondent sued defendant college for damages suffered as the result of a breach of contract of employment as associate professor of tropical diseases and as head of the department of research. From a judgment for one year's salary with interest defendant appeals on the grounds: (1) There was no contract in that the minds of the parties did not meet; (2) respondent falsely represented his physical condition; (3) no breach was proved; (4) interest is not allowable.

### A CONTRACT CREATED BY DEFINITE MUTUAL PROMISES

Prior to the events herein enumerated appellant maintained in the city of Los Angeles a school for teaching osteopathy and related subjects. In July, 1943, President Henley of the college wrote the American College Bureau, a Chicago employment agency, in his search for a man experienced in bacteriology and qualified to do research in tropical diseases. On August 8, 1943, respondent, then employed at Chester, Pennsylvania, wrote the college that he had been apprised by the bureau of the available position in bacteriology and stated, "I am vitally interested . . . would be delighted to sign on the dotted line provided the salary is commensurate." Four days later. the bureau wrote President Henley that they were sending him the papers of respondent, "who is exceedingly well prepared for bacteriology. He has a physical handicap. Before he had a hunting accident he was a vigorous, athletic man. Of course, since the accident he is a very much handicapped man, but I think this should in no way affect his teaching ability. . . . He has done a great deal of research and writing."

The bureau's letter conveying the information that respondent was very much handicapped was received by appellant about eight days prior to President Henley's first letter to respondent under date of August 24, in which he stated that respondent's "background interests us very much, particularly your experience in the School of Tropical Medicine at Puerto Rico. . . . We have purchased a large lot with two houses on it, one to be used as an animal house for tropical medicine and the other as laboratory facilities, according to the desires of the man who takes charge of the program. We are in a position to offer $3,600 per year. Would this salary

interest you? . . . We are in search of a man in pathology and someone for tropical medicine and parasitology. If you are interested and we could come to an agreement, how soon could you take up your responsibilities? May I hear from you as soon as is convenient.'' Promptly upon receipt of appellant's first letter to him respondent, on August 28, addressed the following to President Henley:

"In reply to your letter of August twenty-fourth: I am pleased with your offer, with the quality of your official academic staff and your plans for the new Institute of Tropical Disease. In this letter I wish to seek nomination for the tropical medicine and parasitology position you have vacant that you wrote about. Your offer of $3600.00 will be satisfactory to me for a nine or ten months academic year. However, I ask $4000.00 per annum if it is to be an academic year of twelve months. . . .

"I can wind up my affairs within two weeks and possibly be in your state in approximately that time limit from the moment that I have received definite assurance that I am employed by you and have written my assent. But first, please let me know if you have any objections to employing one who is physically handicapped if such does not impose any restrictions on his ability to carry out the responsibilities of the position.

"Enclosed please find a recent photo and the only copy of a recommendation that I have at hand. . . .''

By that letter Dr. Canavan made it clear that he desired the position described by Dr. Henley at the salary specified and that he could go to Los Angeles within two weeks after his employment was certain. Although Dr. Henley had made no reference to the subject respondent emphasized his physical handicap by demanding to know whether there were "any objections to employing one who is so physically handicapped,'' and enclosed a commendatory letter which repeated the fact of his crippled condition.

In his reply to respondent's inquiry, on September 9 President Henley in a letter to respondent not only clarified appellant's position with respect to the immateriality of the physical handicap but indicated that he deemed it a probable advantage. That letter in part is as follows:

"We were very pleased to receive your letter indicating your desire to serve on our staff. You mention a physical handicap. As long as it does not interfere with your research

abilities, we would not have any objections whatever. In fact, we can think of some physical handicaps which would even improve one's ability as a research worker.

"We are able to offer you $3,600 per year for a ten month academic year. It might be possible for you to pick up some money in the Graduate School teaching in their intensive courses which are offered twice each year. We could not guarantee that, but it is possible, depending upon the subject matter of the course. . . .

"The program is yours as soon as you report for work. . . ."

Having accepted the offer of appellant by his letter of September 15 respondent proceeded promptly to make preparations for his departure for his new home. But in his anxiety concerning the effect his physical condition might have upon appellant, while waiting for his transportation on September 26 he directed a letter to appellant with a view of ascertaining whether President Henley had any "reservations in mind as to the desirability" of having a person so afflicted to serve the college. After commenting in full upon his unavoidable delays the letter proceeds:

"As I have not gotten any transportation as yet, in the enforced delay I am wondering if you too will turn me down because I am on crutches. I would not want to come out there and find that I have to come right back. Accordingly, I am taking this time to find out if you have any objections or reservations in mind as to the desirability of having me with you. There will be plenty of time to receive your reply and I await your reaction re the above as to whether I shall cancel my RR reservation or not.

"Please do not hesitate to be frank in your reply. . . ."

Reassurance promptly came to respondent in the form of a telegram from Dr. Henley on October 5: "If you can do the work a handicap no obstacle." This was followed by Dr. Henley's letter of October 4th the contents of which affirmed the immateriality of respondent's handicap if he could do the work, and declared that: (1) Many of the finest lecturers in medical schools have been crippled; (2) his chief obligation would be in research; (3) respondent's ability to do the work can be judged only by himself; (4) his title would be Associate Professor of Tropical Medicine and Head of the Research Department of the Institute of Tropical Disease.

In his reply to that letter respondent wrote the college on October 9, saying: "There is no question in my mind. I can do the work. . . . You have removed the last obstacle . . . namely, that possibly you would not want me on crutches. . . . I have a Brown-Sequard modified syndrome due to partial lesion of the cord. . . . As for stairs. . . . I cannot negotiate a flight unassisted. . . . Hence you note I am preparing to move west and I am pulling up stakes here as I expect to be with you a long time. . . . O. K. then, everything's settled. I'll come as soon as I can."

The language employed by these men shows that the minds of the parties met upon the essential factors of respondent's employment. That understanding is evidenced by respondent's acceptance on September 15 of appellant's offer on September 9. Appellant outlined the nature of the duties to be performed, the salary to be paid and positively declared that the position was available as soon as respondent could report for work. The acceptance was a succinct affirmation of the offer and his promise to depart as soon as transportation was available. The subsequent correspondence formed no part of the contract but merely served to interpret the letters which had composed it. If the college entertained a doubt that the physical handicap would make respondent undesirable for the position, such decision should have been immediately communicated to respondent. Silence then implied a concurrence with the sentiments of respondent's final letter.

In addition to the fact that the intention of the parties to effect an employment is found in their correspondence other evidences seal the verdict. In a letter to the bureau under date of September 22 appellant declared that it had employed respondent. Its failure to answer respondent's letter of October 9 was an approval of its contents and confirmation of the agreement already reached. If others had successfully performed such services in a wheel-chair, Dr. Henley reasoned that respondent could do as well. He was employed for his intellectual worth, not for his pedal agility.

If the language of the letters lacks further clarification the conduct of the parties on the arrival of respondent at the college on October 20 will make their mutual purpose clear. Then, Dr. Henley was glad to see Dr. Canavan. Dr. Bell, an instructor, had just remarked that respondent would

soon arrive "and we had better get ready for him." Dr. Henley then informed respondent that "they had no laboratory set up; that it was his program and it would be for him to set it up as he wanted it; that the college had some equipment but they did not know what he would require." Also on the following day Dr. Henley told respondent that he believed respondent could do the work if he had the place set up and ready. No conversation could have shown more definitely that appellant then understood that the correspondence constituted a binding contract.

If any uncertainty exists in a written contract the first rule to be observed is that its interpretation must be determined by its own language (Civ. Code, §§ 1638, 1639) and from all of it. (*Hunt* v. *United Bank & Trust Co.*, 210 Cal. 108 [291 P. 184].) If other sources need be consulted resort may be had to the acts whereby the parties gave their own interpretation to it, when such acts were positive and deliberate and done in an attempted compliance with the terms of the agreement. (*Barnhart Aircraft, Inc.* v. *Preston*, 212 Cal. 19, 24 [297 P. 20].) Conceding the language of the correspondence to be susceptible of more than one construction, yet under the rules governing the interpretation of ambiguous writings it must be held that a binding agreement of the parties hereto was reached prior to respondent's departure from Pennsylvania. An ambiguous contract should be construed in the light of the circumstances under which it was made. (*McIllmoil* v. *Frawley Motor Co.*, 190 Cal. 546, 552 [213 P. 971]; *In re Prather's Estate*, 183 Cal. 314, 318 [191 P. 521].) Also, in construing such an instrument the court must consider it in its entirety and give to each clause the qualification evidently intended by the authors, including the purpose, nature and subject matter as well as the preliminary negotiations. The task of construing a contract is further lightened by the rules (1) that it must receive such interpretation as will make it definite, reasonable and operative (Civ. Code, § 1643), and (2) that such construction is permissible as will make it valid (6 Cal. Jur., p. 268). In view of the conduct of the parties at the first meeting of respondent and President Henley the finding that the parties "entered into a contract of employment in writing" comes to this court with a fortification which does not ordinarily accompany a finding of the existence of a contract the construction of which is derived from the four

corners of a written document. (*Eggert* v. *Pacific States Savings & Loan Co.*, 57 Cal.App.2d 239 [135 P.2d 412, 136 P.2d 822]; *Thew* v. *Thew*, 35 Cal.App.2d 691, 695 [96 P.2d 826].)

Appellant's contention is that the letter of September 9 is a conditional offer. Its language does not reasonably convey such meaning. The court found that plaintiff was able to perform the required services and that he was physically fit to perform them; that performance was not made a condition precedent to the contract but that the offer was made to respondent and was accepted by him. Canavan promised to render specific services for a definite period; appellant promised to pay him a specified salary. The possibility that respondent might have become at some future time incapable of performing the services for which he was employed furnished no ground for his rejection or discharge on the second day of his appearance at the college. Should such inability have been disclosed at a subsequent date the opportunity would then be at hand for a rescission of the contract.

A discharge cannot be based upon a hope or fear that the employee will at a later time become disqualified. His employment implies his ability (39 C.J. 122, 161); the testimony proves it and the court found it to be a fact.

The law imputes to a contractor an intention in accordance with the reasonable meaning of his words and acts and judges his intent thereby. Courts will not in deriving one's intention be controlled by an unexpressed state of mind. (*Zurich General Accident & Liability Assurance Co., Ltd.* v. *Industrial Acc. Com.*, 132 Cal.App. 101, 103 [22 P.2d 572].) The test applied in the cited case was not that the mill operator did not intend to employ the applicant but whether the operator's conduct was such as to lead the applicant acting as a reasonable man to believe that in fact he was being employed. Evidence which tends to show a concurrence in the actual understanding of the parties is controlling. (*McConnell* v. *Lamontagne*, 82 N.H. 423 [134 A. 718].)

In support of his contention that the minds of the parties never met, since Dr. Henley had in mind a man physically fit, appellant cites *Blake* v. *Mosher*, 11 Cal.App.2d 532 [54 P.2d 492]. It is not authority. There the only writing was a memorandum acknowledging receipt for a partial payment

for the chattels to be purchased, containing a statement that the balance was payable $2,000 cash and $2,000 "in a note well secured." The writing was "absolutely blank as to the terms and conditions" of the $2,000 note and the minds of the parties never met upon the terms and conditions of the proposed instrument.

### THE CHARGE OF FALSE REPRESENTATION

The contention of appellant that respondent misrepresented his physical condition is not a proper subject for review by this court. If it is made for the purpose of demonstrating that a fraud was committed on the college it is out of place because no fraud was alleged and no attempt was made to prove one. (*Security First National Bank v. Stack,* 32 Cal.App.2d 586, 591 [90 P.2d 337].) If it is made for the purpose of showing that the minds of the parties never met upon the subject of respondent's ability to perform the services he had promised to perform, such contention is a stultification in view of the language of the correspondence and the construction given to it by the parties. Whether respondent was handicapped by a "Brown-Sequard modified syndrome"—modified for his betterment or for his detriment—the trial court found that he was in all respects qualified to perform his contract. If he did not disclose his true condition by his letter of September 9 as well as by that of September 26, English is an ineffective vehicle for conveying intelligence.

### THE CONTRACT WAS BREACHED

Appellant's contention that respondent "wholly failed to show a breach of contract" is founded upon a disregard of the court's finding and of respondent's testimony which contradicted that of Dr. Henley and his two associates. Respondent arrived in Los Angeles on October 19 pursuant to his contract, and on the next day called at the college and conversed amiably with his prospective associates about his duties. After he had stated that he would require a handrail to negotiate the stairway, Dr. Henley ordered that adjunct to be installed and asked Dr. Canavan to give his trunk check and ration book to the secretary. On being advised that the cost of the necessary equipment would be $3,000 Dr. Henley agreed that such expense was reasonable and would be provided. While respondent was on the campus on October 21st he was called to the office of Dr. Henley who

said: "I am sorry. I have changed my mind. I have made a mistake in your case. I have not been able to evict the tenant from the house in which you were to work." The president then extended his remarks about his difficulties and concluded that he could "possibly be ready" for respondent a year later. He commented upon the problems of respondent's getting around and of his taking too much time in travel between the restaurant and his home. He then requested a statement of expenses incurred in making the journey. Dr. Canavan declared his desire to remain, but to no avail. While the words of the president were few, they were effective. What he said and did was sufficient to indicate a clear intention to dispense with respondent's services (*Percival* v. *National Drama Corporation*, 181 Cal. 631 [185 P. 972]) in violation of the contract of employment and of section 2924, Labor Code, which inhibits the termination of employment for a specified term except in case of a wilful breach of duty, of habitual neglect of, or continued incapacity to perform, a duty.

### RESPONDENT ENTITLED TO INTEREST

■ Finally, appellant assigns as error that part of the judgment awarding interest. Respondent was awarded a year's salary with interest on each monthly installment commencing with November 21, 1943. There was no error in the award of interest. While the breach occurred on October 21, 1943, and the action was filed April 14, 1944, it came on for trial in December, 1944, after all installments due under the contract had become payable. It having been found upon substantial evidence that respondent had exercised reasonable diligence in his endeavors to obtain other employment, he was entitled to interest on each monthly payment from and after the particular day on which his right of recovery arose. (Civ. Code, § 3287.) ■ Every judgment awarding damages certain or capable of being made certain by calculation on a particular day may include interest from that day. (*W. F. Boardman Co.* v. *Petch*, 186 Cal. 476, 484 [199 P. 1047].) That case declares also that a servant may recover stipulated wages for a year if his contract is for the year and he is unjustly prevented from performance by his employer. Interest would be payable from the due date of each installment. *Seymour* v. *Oelrichs*, 156 Cal. 782 [106 P. 88, 134 Am.St.Rep. 154], is not pertinent. There the action

was tried before the end of the contract period and the credits that might have become due the employer could not yet be known.

The judgment is affirmed.

McComb, J., and Wilson, J., concurred.

A petition for a rehearing was denied April 2, 1946, and appellant's petition for a hearing by the Supreme Court was denied May 9, 1946.